# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA STATE UNIVERSITY RESEARCH FOUNDATION, INC. AND RED HILLS SIGNAL SYSTEMS, LLC<br><br>*Plaintiffs,*<br><br>v.<br><br>AT&T SERVICES, INC.; AT&T MOBILITY LLC; AT&T ENTERPRISES, LLC; VERIZON COMMUNICATIONS, INC.; CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS; AND T-MOBILE USA, INC.<br><br>*Defendants.* | Civil Action No. 4:2026-cv-00047<br><br>JURY TRIAL DEMANDED |

### COMPLAINT FOR PATENT INFRINGEMENT

1.    This is an action for infringement of U.S. Patent Nos. 9,838,104 ("the '104 Patent") and 8,817,693 ("the '693 Patent") (collectively, the "Patents-in-Suit"). The Patents-in-Suit were awarded to computer scientists for their pioneering work at Florida State University and are owned by Florida State University Research Foundation, Inc. ("FSURF"), a non-profit 501(c)(3) organization that promotes, licenses, and commercializes Florida State University's intellectual property. The Patents-in-Suit are exclusively licensed by FSURF to Red Hills Signal Systems, LLC ("Red Hills").

2.    Defendants AT&T Services, Inc.; AT&T Mobility LLC; and AT&T Enterprises, LLC (collectively, "AT&T"); Verizon Communications, Inc. and

1

Cellco Partnership d/b/a Verizon Wireless (collectively, "Verizon"); and T-Mobile USA, Inc. ("T-Mobile") (AT&T, Verizon, and T-Mobile are collectively referred to herein as "Defendants") infringe the Patents-in-Suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq.*

3.     The Florida State University Research Foundation was formed to promote, encourage and assist in the research and educational activities at Florida State University via various support mechanisms using income generated from research and technology transfer initiatives.    The purpose of the Florida State University Research Foundation "is to promote and assist the research and training activities of the University through income from contracts, grants, and other sources, including income derived from the development and commercialization of the University's work products."[1]

4.     Founded in 1851, Florida State University is a comprehensive, national, graduate-research institution with more than 44,000 students, over 2,000 faculty members, and more than 270 outstanding academic and professional degree programs.    In 2024, Florida State University generated more than $415 million in external research funding from private foundations, industries, and state and federal government agencies.    Florida State University has produced groundbreaking

---

[1] FLORIDA STATE UNIVERSITY FOUNDATION FINANCIAL STATEMENTS AND REPORTS FOR THE FISCAL YEARS ENDED JUNE 30, 2025 AND 2024 at 46 (November 19, 2025).

research that has earned its faculty Nobel Prizes, National Academy memberships, and international recognition across fields ranging from nuclear physics and photochemistry to molecular biology and computer science.

5. This case arises from Defendants' infringement of patents protecting the groundbreaking work of researchers at Florida State University in the field of wireless communication systems. The patents disclose systems and methods for compressing Channel State Information using sinusoidal basis functions and for intelligent packet relay protocols in wireless networks. These innovations have become fundamental building blocks of modern 5G cellular networks deployed by the Defendants throughout the United States.

## PARTIES

6. Plaintiff Florida State University Research Foundation, Inc. ("FSURF") is a Florida non-profit corporation with its principal place of business at 2010 Levy Avenue, Tallahassee, Florida 32310. FSURF is the owner by assignment of the Patents-in-Suit.

7. Red Hills Signal Systems, LLC ("Red Hills") is a Delaware limited liability company. Pursuant to a license agreement with FSURF, Red Hills is the exclusive licensee to the Patents-in-Suit.

8. Defendant AT&T Enterprises, LLC ("AT&T Enterprises") is a limited liability company organized and existing under the laws of Delaware, with two

principal places of business: one at One AT&T Way, Bedminster, New Jersey 07921, and one at 208 S. Akard Street, Dallas, Texas 75202. AT&T Enterprises is registered with the Florida Department of State, Division of Corporations with a Status of "Active." AT&T Enterprises maintains a registered agent within the State of Florida: CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324.

9.    Defendant AT&T Services, Inc. ("AT&T Services") is a corporation organized and existing under the laws of Delaware, with a principal place of business at 208 S. Akard Street, Dallas, Texas 75202. AT&T Services is registered with the Florida Department of State, Division of Corporations with a Status of "Active." AT&T Services maintains a registered agent within the State of Florida: CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324.

10.    Defendant AT&T Mobility LLC ("AT&T Mobility") is a limited liability company organized and existing under the laws of Delaware, with a principal place of business at 1025 Lenox Park Blvd. NE, Atlanta, Georgia 30319. AT&T Mobility is registered with the Florida Department of State, Division of Corporations with a Status of "Active." AT&T Mobility maintains a registered agent within the State of Florida: CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324.

11.    Defendant Verizon Communications, Inc. ("VCI") is a corporation

organized and existing under the laws of Delaware, with its principal place of business at 1095 Avenue of the Americas, New York, New York 10036. VCI is registered with the Florida Department of State, Division of Corporations with a Status of "Active." VCI maintains a registered agent within the State of Florida: CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324.

12.    Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless") is a partnership organized and existing under the laws of Delaware, with a principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920. Verizon Wireless is registered with the Florida Department of State, Division of Corporations as a General Partnership with a Status of "Active." Verizon Wireless maintains a registered agent within the State of Florida: CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324.

13.    Defendant T-Mobile USA, Inc. ("T-Mobile") is a corporation organized and existing under the laws of Delaware, with a principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006. T-Mobile is registered with the Florida Department of State, Division of Corporations with a Status of "Active." T-Mobile maintains a registered agent within the State of Florida: Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

## JURISDICTION AND VENUE

14.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

15.     AT&T, Verizon, and T-Mobile are all subject to this Court's personal jurisdiction consistent with the principles of due process and the Florida Long Arm Statute, including specifically Florida Stat. § 48.193(1)(a)(1)-(2), § 48.193(1)(a)(6)(a)-(b), and § 48.193(2).

16.     Personal jurisdiction exists generally over the Defendants because AT&T, Verizon, and T-Mobile each have sufficient minimum contacts and/or have engaged in continuous and systematic activities in the forum as well as a result of business conducted within Florida, including the Northern District of Florida. Personal jurisdiction also exists over Defendants because AT&T, Verizon, and T-Mobile, directly or through subsidiaries, make, use, sell, offer for sale, import, advertise, make available, and/or market products and services within Florida, including the Northern District of Florida, that infringe one or more of the Patents-in-Suit.  Further, on information and belief, each Defendant has placed or contributed to placing infringing products and/or services into the stream of commerce knowing or understanding that such products and/or services would be sold and used in the United States, including in this judicial District.

17.    Defendants are all registered to do business in Florida, currently listed as "Active" businesses within Florida, and each Defendant maintains an agent authorized to receive service of process within Florida.

18.    Plaintiff FSURF is a Florida not-for-profit corporation.  FSURF is a direct-support organization organized and existing under Florida Stat. § 1004.28 to directly support Florida State University.  FSURF's principal place of business is located within this judicial District in Tallahassee, Florida.

19.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).

20.    AT&T, Verizon, and T-Mobile have each committed acts of infringement in this judicial District, and each have a regular and established place of business in this District.  AT&T, Verizon, and T-Mobile each make, use, sell, offer to sell, and/or import products and/or services that are accused of infringing the Patents-in-Suit into and/or within this District, and each of AT&T, Verizon, and T-Mobile maintain a permanent and/or continuing presence within this District.

### AT&T'S PRESENCE IN THE NORTHERN DISTRICT OF FLORIDA

21.    AT&T operates one or more wireless telecommunications networks, including but not limited to the brand names "AT&T" and "Cricket Wireless" (collectively, the "AT&T Wireless Networks").  The AT&T Wireless Networks

include network infrastructure and provide wireless coverage throughout the United States, including within the Northern District of Florida.

22.    AT&T also advertises in the Northern District of Florida, including but not limited to advertising the geographic coverage of the AT&T Wireless Network within this District.  By way of example, AT&T's website provides a "Wireless coverage map" that advertises AT&T's current 5G wireless network coverage in and around Tallahassee, Florida.



*Wireless coverage map*, AT&T WEBSITE, *available at*: https://www.att.com/maps/wireless-coverage.html (last accessed December 2025).

23.    AT&T also operates numerous brick and mortar retail stores in the Northern District of Florida.  These retail stores are physically located within this District; are regular and established places of business of AT&T (as that term is used in 28 U.S.C. § 1400(b)); and are used by AT&T to actively market and sell services for the AT&T Wireless Networks that infringe the Patents-in-Suit.  By way of

example, AT&T's website provides an "AT&T Stores Near You" feature that shows the locations of such AT&T retail stores within this District.



*AT&T Stores Near You*, AT&T WEBSITE, *available at*: https://www.att.com/stores/ (last accessed December 2025).

24.     By way of example and without limitation, AT&T maintains brick and mortar retail stores in this District located, among other places, in <u>Tallahassee</u> (3122 Mahan Dr., Ste. 403, Tallahassee, FL 32308; 100 N. Magnolia Dr., Tallahassee, FL 32301; 4067 Lagniappe Way, Tallahassee, FL 32317; 2615 Monroe Street, Ste. 2, Tallahassee, FL 32303; 3521 Thomasville Road, Ste. C, Tallahassee, FL 32309; 1706 W. Tennessee St., Tallahassee, FL 32304); <u>Gainesville</u> (3720 NW 13th Street, Ste. 5, Gainesville, FL 32609; 3626 SW Archer Road, Gainesville, FL 32608; 6110 NW 4th Place, Gainesville, FL 32607); <u>Pensacola</u> (4850 Mobile Hwy, Ste. B, Pensacola, FL 32506; 5090 N. 9th Ave., Pensacola, FL 32504; 7171 Davis Hwy, Pensacola, FL 32504; 9506 W Highway 98, Ste. 600, Pensacola, FL 32506; 1680 E Nine Mile Rd., Pensacola, FL 32514; 9000 Pensacola Blvd., Pensacola, FL 32534);

<u>Panama City</u> (2694 Highway 77, Panama City, FL 32405; 4607 Lindsey Crossing, Ste. A-2, Panama City, FL 32404); <u>Navarre</u> (8232 Navarre Pkwy, Ste. B-1, Navarre, FL 32566); <u>Crestview</u> (2711 South Ferdon Blvd., Crestview, FL 32536); and <u>Fort Walton Beach</u> (75 Eglin Pkwy NE, Suite 118, Ft. Walton Beach, FL 32548).

25.    AT&T has numerous employees who work in Florida, including within the Northern District of Florida.  For example, the employees that conduct the business of AT&T at each of its numerous retail locations within Florida and within this District are employees of AT&T.

26.    AT&T has solicited business in the Northern District of Florida, has transacted business within this District, and has derived financial benefit from the residents of this District, including benefits directly related to AT&T's infringement of the Patents-in-Suit.

### VERIZON'S PRESENCE IN THE NORTHERN DISTRICT OF FLORIDA

27.    Verizon operates one or more wireless telecommunications networks, including but not limited to the brand names "Verizon," "TracFone," and "Total Wireless" (collectively, the "Verizon Wireless Networks").  The Verizon Wireless Networks include network infrastructure and provide wireless coverage throughout the United States, including within the Northern District of Florida.

28.    Verizon also advertises in the Northern District of Florida, including but not limited to advertising the geographic coverage of the Verizon Wireless

Network within this District.  By way of example, Verizon's website provides a "Coverage Map" feature that advertises Verizon's current 5G wireless network coverage in and around Tallahassee, Florida.



*Coverage Map*, VERIZON WEBSITE, *available at*: https://www.verizon.com/coverage-map/ (last accessed December 2025).

29.    Verizon also operates numerous brick and mortar retail stores in the Northern District of Florida.  These retail stores are physically located within this District; are regular and established places of business of Verizon (as that term is used in 28 U.S.C. § 1400(b)); and are used by Verizon to actively market and sell services for the Verizon Wireless Networks that infringe the Patents-in-Suit.  By way of example, Verizon's website provides a "Find a Verizon store" search feature that shows the locations of such Verizon retail stores within this District.



*Find a Verizon store*, VERIZON WEBSITE, *available at*: https://www.verizon.com/stores/ (last accessed December 2025) (displaying search results for "Tallahassee, FL 32301").

30.    By way of example and without limitation, Verizon maintains brick and mortar retail stores in this District located, among other places, in <u>Tallahassee</u> (2014 Apalachee Pkwy, Tallahassee, FL 32301; 2110 N. Monroe St., Tallahassee, FL 32303; 1622 Capital Cir. NE, Tallahassee, FL 32308; 4210 W. Tennessee St., Tallahassee, FL 32304; 1400 Village Square Blvd., Tallahassee, FL 32312); <u>Gainesville</u> (2612 NW 13th Street, Gainesville, FL 32609; 3401 SW Archer Rd., Gainesville, FL 32608; 6921 W. Newberry Rd., Gainesville, FL 32605); <u>Pensacola</u> (5100 N. 9th Ave., Pensacola, FL 32504; 5600 N. 9th Ave., Pensacola, FL 32504; 400 N. Navy Blvd., Pensacola, FL 32507; 7000 N. Davis Hwy, Pensacola, FL 32504; 5920 Mobile Highway, Pensacola, FL 32526; 1791 E. Nine Mile Rd., Pensacola, FL 32514; 10427 Sorrento Road, Pensacola, FL 32507; 2200 W. 9 Mile Rd., Pensacola,

FL 32534); <u>Panama City</u> (411A E. 23rd St., Panama City, FL 32405; 515 N. Tyndall Pkwy, Panama City, FL 32404); <u>Lynn Haven</u> (1419 Ohio Ave., Lynn Haven, FL 32444); <u>Navarre</u> (8690 Navarre Pkwy, Navarre, FL 32566); <u>Crestview</u> (1900 S. Ferdon Blvd., Crestview, FL 32536; 1316 N. Ferdon Blvd., Crestview, FL 32536); and <u>Fort Walton Beach</u> (575 Beal Pkwy NW, Fort Walton Beach, FL 32548; 73 Eglin Pkwy NE, Fort Walton Beach, FL 32548).

31.    Verizon has numerous employees who work in Florida, including within the Northern District of Florida.  For example, the employees that conduct the business of Verizon at each of its numerous retail locations within Florida and within this District are employees of Verizon.

32.    Verizon has solicited business in the Northern District of Florida, has transacted business within this District, and has derived financial benefit from the residents of this District, including benefits directly related to Verizon's infringement of the Patents-in-Suit.

### T-MOBILE'S PRESENCE IN THE NORTHERN DISTRICT OF FLORIDA

33.    T-Mobile operates one or more wireless telecommunications networks, including but not limited to the brand names "T-Mobile," "Sprint Mobile," "Metro by T-Mobile," "Mint Mobile," "Ultra Mobile," "US Cellular," and "Assurance Wireless" (collectively, the "T-Mobile Wireless Networks").  The T-Mobile

Wireless Networks include network infrastructure and provide wireless coverage throughout the United States, including within the Northern District of Florida.

34.    T-Mobile also advertises in the Northern District of Florida, including but not limited to advertising the geographic coverage of the T-Mobile Wireless Network within this District.  By way of example, T-Mobile's website provides a "Coverage map" that advertises T-Mobile's current 5G wireless network coverage in and around Tallahassee, Florida.



*Coverage map*, T-MOBILE WEBSITE, *available at*: https://www.t-mobile.com/coverage/coverage-map?INTNAV=tNav%3ACoverage%3A5G4G CoverageMap (last accessed December 2025).

35.    T-Mobile also operates numerous brick and mortar retail stores in the Northern District of Florida.  These retail stores are physically located within this District; are regular and established places of business of T-Mobile (as that term is used in 28 U.S.C. § 1400(b)); and are used by T-Mobile to actively market and sell services for the T-Mobile Wireless Networks that infringe the Patents-in-Suit.  By

way of example, T-Mobile's website provides a "Find a store" feature that shows the locations of such T-Mobile retail stores within this District.



*Find a location*, T-MOBILE WEBSITE, *available at*: https://www.t-mobile.com/stores/locator/?INTNAV=tNav%3AStoreLocator&page=1&loc=Talla hassee,%20Florida (last accessed December 2025).

36.    By way of example and without limitation, T-Mobile maintains brick and mortar retail stores in this District located, among other places, in <u>Tallahassee</u> (1496 Apalachee Parkway, Ste. 13, Tallahassee, FL 32301; 2264 N. Monroe St., Ste. 2, Tallahassee, FL 32303; 3122 Dick Wilson Blvd., Tallahassee, FL 32301; 4610 W. Tennessee St., Tallahassee, FL 32304; 6672 Thomasville Rd., Ste. 1, Tallahassee, FL 32312); <u>Gainesville</u> (3600 SW Archer Rd., Ste. C, Gainesville, FL 32608; 2 NW 16th Ave., Gainesville, FL 32601; 4001 SW 30th Pl., Gainesville, FL 32608; 6419 Newberry Rd., Ste. H0004, Gainesville, FL 32605); <u>Pensacola</u> (6601 N. Davis Hwy, Ste. 3, Pensacola, FL 32504; 520 N. Navy Blvd., Ste. E, Pensacola, FL 32507; 5010 Bayou Blvd., Ste. 109, Pensacola, FL 32503; 1250 Airport Blvd., Pensacola, FL 32504; 5998 Mobile Hwy, Ste. 9, Pensacola, FL 32526; 5600 W.

Highway 98, Bldg. 3725, Pensacola, FL 32507; 250 Saufley St., Bldg. 607, Pensacola, FL 32508; 312 E. Nine Mile Rd., Ste. 10, Pensacola, FL 32514); Panama City (504 E. 23rd St., Panama City, FL 32405; 1707 W. 23rd St., Panama City, FL 32405; 1047 W. 23rd St., Ste. A, Panama City, FL 32405); Navarre (8860 Navarre Pkwy, Navarre, FL, 32566); Crestview (2495 S. Ferdon Blvd., Crestview, FL 32536); and Fort Walton Beach (165 Eglin Pkwy NE, Ft. Walton Beach, FL 32548; 413 Mary Esther Cut Off, Ft. Walton Beach, FL 32548; 740 Beal Pkwy, Ft. Walton Beach, FL 32547).

37.    T-Mobile has numerous employees who work in Florida, including within the Northern District of Florida.  For example, the employees that conduct the business of T-Mobile at each of its numerous retail locations within Florida and within this District are employees of T-Mobile.

38.    T-Mobile has solicited business in the Northern District of Florida, has transacted business within this District, and has derived financial benefit from the residents of this District, including benefits directly related to T-Mobile's infringement of the Patents-in-Suit.

## JOINDER (35 U.S.C. § 299)

39.    Each Defendant is properly joined in this action pursuant to 35 U.S.C. § 299(a) as Plaintiffs' rights to relief for infringement of the Patents-in-Suit arise out of the same transaction, occurrence, or series of transactions or occurrences relating

to the making, using, offering for sale, and/or selling of the same accused product or process, and questions of fact common to all Defendants will arise in this action.

40.    Plaintiffs' claims arise from the same series of transactions and occurrences involving Defendants' provision of a single, functionally identical 5G wireless network service that implements the same standardized 5G network functions and practices the Patents-in-Suit in the same manner.

41.    Although Defendants market their respective provision of 5G wireless service under different retail brands, the accused product for purposes of § 299 is not branding or billing identity, but the 5G network service itself, including radio access, core network signaling, authentication, mobility management, and data delivery. Defendants' 5G network service is implemented in accordance with the 5G Standard and delivered nationwide to subscribers, enterprises, and wholesale customers.

42.    From the perspective of network operation, downstream customers, and enterprise developers, Defendants' 5G network services are commercially and functionally interchangeable, and each Defendant supplies materially the same accused product in the same manner.

43.    Defendants have publicly acknowledged that they are working together to unify, aggregate, and jointly commercialize network-level 5G capabilities across their respective nationwide networks.

44.     On February 27, 2025, Defendants announced that they formed a joint venture to deliver standardized 5G network application programming interfaces ("APIs") in the United States through a common platform, stating this initiative "unif[ies] network capabilities across major U.S. telecom providers" and "combin[es] and sell[s] network APIs from multiple operators under a unified platform." *AT&T, T-Mobile and Verizon come together to bring first standardized 5G Network APIs to the U.S. leveraging Aduna*, ADUNA PRESS RELEASE (Feb. 27, 2025), *available at*: https://adunaglobal.com/newsroom/att-t-mobile-and-verizon-come-together-to-bring-first-standardized-5g-network-apis-to-the-us-leveraging-aduna/ (last accessed December 2025).

45.     Defendants further explained that this collaboration "makes [each Defendant's] network, along with all participating networks, into ***a platform***" and enables applications that "***work seamlessly on any network***, anywhere." *Id.* (emphasis added).

46.     Defendants have placed their respective 5G network capabilities into a shared commercial stream of commerce, rendering those capabilities interoperable, substitutable, and commercially indistinguishable for purposes of delivering the accused network functionality.

47.    Defendants' joint commercialization of network-level 5G capabilities gives rise to common questions of fact regarding how Defendants' networks implement the asserted patent claims, and independently satisfies § 299(a).

48.    Defendants further offer the same accused 5G product through overlapping wholesale and Mobile Virtual Network Operator ("MVNO") relationships, pursuant to which Defendants sell 5G network access as a wholesale input to common downstream customers.

49.    Publicly disclosed MVNO arrangements demonstrate that MVNOs routinely purchase wholesale 5G connectivity from multiple Defendants simultaneously and offer a single retail service that is dynamically provisioned across different Defendants' networks based on availability, coverage, or commercial terms.

50.    In such arrangements, the identity of the underlying carrier is abstracted away from the MVNO and the end user, and the accused 5G service is delivered as a fungible wholesale product regardless of which Defendant's network equipment is utilized at any given time.

51.    For example, MVNO DataXoom provides 5G wireless services to its end customers by purchasing wholesale access to all three of AT&T, Verizon, and T-Mobile's 5G networks:

DX provides Mobility Services and Solutions via their proprietary mobility platform and via direct API connectivity (the **"DX Services"**). These Mobility Services and Solutions may include 3G and 4G LTE/5G wireless Internet access services (Mobile Data) provided by DX's third-party licensors, including but not limited to AT&T, Verizon, Sprint, T-Mobile, Rogers Wireless, and Telus (also referred to herein, individual, and/or collectively, as "Carrier" or "Carriers"). DataXoom is not a Carrier but may provide wireless services as part of their DX Services. DX provides the DX Services to Customers throughout the United States. DX Services, in whatever form, and any derivatives thereof, is the sole property of DX and as such, DX retains all rights to the DX Services.

*DataXoom, Inc. Agreement*, DATAXOOM WEBSITE, *available at*: https://www.dataxoom.com/terms-and-conditions/ (last accessed December 2025) (emphasis added).

52.    MVNO Global Data Telecom similarly advertises the use of each of the Defendants' 5G networks:



GLOBAL DATA TELECOM CORP. WEBSITE, *available at*: https://globaldatatelecom.com/ (last visited December 2025) (emphasis added).

53.    On information and belief, additional MVNO companies also utilize more than one of Defendants' 5G networks, including but not limited to: US Mobile; Ting Mobile; and RedPocket Mobile.

54.    Defendants' provision of wholesale 5G network services to common MVNO customers establishes contractual and commercial privity among

Defendants with respect to the accused product and further confirms that Defendants' 5G services arise from the same series of transactions and occurrences.

55.    Defendants' 5G networks are not isolated or self-contained systems. Defendants maintain roaming, interconnection, and network access arrangements that permit subscriber devices and network traffic to utilize another carrier's network where necessary to provide continuity of service.

56.    Under these arrangements, Defendants' networks interoperate at the signaling, authentication, and mobility management levels, and subscriber traffic may be carried over another Defendant's radio access network while maintaining a seamless user experience.

57.    For example, AT&T explains to customers: "We provide coverage for most of the country using our own network and for some of the places where we don't have our own network we provide coverage <u>by contracting with a carrier</u> who has coverage in that area.  We call these areas off-net coverage." *Learn about domestic off-network data use*, AT&T WEBSITE, *available at*: https://www.att.com/support/article/wireless/KM1045445/ (last accessed December 2025) (emphasis added).  T-Mobile similarly explains: "When you travel outside of T-Mobile's U.S. network areas, your phone <u>automatically switches to use one of our wireless network partners</u> where available when you have data roaming enabled." *Domestic roaming data*, T-MOBILE WEBSITE, *available at*: https://www.t-

mobile.com/support/coverage/domestic-roaming-data (last accessed December 2025) (emphasis added). Verizon also explains to its customers: "When you connect to a non-Verizon network in the US … you are roaming domestically. … Whether you are using your device on the Verizon network or roaming domestically, <u>you don't have to change anything on your phone</u>." *Domestic roaming FAQs*, VERIZON WEBSITE, *available at*: https://www.verizon.com/support/domestic-roaming-faqs/ (last accessed December 2025) (emphasis added).

58. International roaming agreements further demonstrate the interoperability and standardized nature of Defendants' 5G wireless networks. Major international mobile network operators routinely interconnect with multiple U.S. carriers, often including more than one of Verizon, AT&T, and/or T-Mobile's networks, to enable roaming services for their subscribers while those subscribers are physically present in the United States. These roaming relationships require technical compatibility at the radio access network, core network, authentication, mobility management, and signaling layers, and depend on adherence to the 5G Standard to permit foreign subscribers' devices to register, attach, and exchange data on Defendants' networks in the United States.

59. For example, international carrier Vodafone maintains roaming relationships with each of AT&T, Verizon, and T-Mobile.

> We currently have three Roaming partners in the USA that provide nationwide coverage
>
> - AT&T
> - T Mobile USA
> - Verizon

*Travelling Abroad*, VODAFONE IRELAND WEBSITE, *available at*: https://n.vodafone.ie/support/mobile/travelling-abroad.html? (last accessed December 2025).

60. On the same webpage, Vodafone states that "5G is available with RED Roaming," which is the branding Vodafone provides for access to roaming coverage outside Ireland, including in the United States. *Id.*

61. Likewise, the Swiss mobile network operator, Sunrise, identifies roaming interconnections with each of AT&T, Verizon, and T-Mobile. Sunrise further identifies that each of AT&T, Verizon, and T-Mobile's 5G networks is available to Sunrise subscribers when they are physically present (*i.e.*, roaming) in the United States.

| Roaming partner details | | | | | | | | | ✕ |
|---|---|---|---|---|---|---|---|---|---|
| | Internet | | | | Telephony/SMS | | | IoT applications | |
| | 2G (GPRS) | 3G (UMTS) | 4G (LTE) | 5G (NR) | 2G/3G (GSM) | 4G/5G (VoLTE) | SMS | LTE-M | NB-IoT |
| Limitless Mobile, LLC | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ | ✗ | ✗ |
| The Alaska Wireless Network, LLC | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ | ✗ | ✗ |
| T-Mobile United States | ✗ | ✗ | ✓ | ✓ | ✗ | ✓ | ✓ | ✓ | ✗ |
| Cellular One | ✗ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ | ✗ | ✗ |
| Commnet Wireless | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ | ✗ | ✗ |
| AT&T Mobility | ✗ | ✗ | ✓ | ✓ | ✗ | ✓ | ✓ | ✓ | ✗ |
| Verizon | ✗ | ✗ | ✓ | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ |

*Enjoy The Best Connection Abroad*, SUNRISE WEBSITE, *available at*: https://www.sunrise.ch/en/mobile/roaming (last accessed December 2025) (showing the "View provider details" hyperlinked pop-up corresponding to "United States (USA)" for the "Choose your destination" selection and "Swiss Connect Europe+" for the "Choose your mobile subscription" selection).

62.    These examples illustrate that Defendants' 5G networks are not isolated or proprietary silos, but rather operate as interoperable implementations of the same standardized 5G technology, capable of supporting roaming subscribers from the same foreign carriers across multiple U.S. networks. These interconnection arrangements reinforce that Defendants' 5G network services are technically interoperable and commercially coordinated, and that the accused network

functionality is implemented in materially the same manner across Defendants' networks.

63.   Spectrum transactions further confirm the fungible and interchangeable nature of the network resources underlying Defendants' accused 5G services.

64.   Nationwide carriers, including Defendants, routinely acquire and divest spectrum licenses used for 5G deployment through Federal Communications Commission-approved secondary-market transactions, including mid-band and refarmed spectrum essential to 5G service.

65.   These spectrum transactions demonstrate that the core inputs enabling Defendants' 5G services are treated as fungible commodity assets within a shared commercial ecosystem, reinforcing the functional equivalence of the resulting 5G services offered by each Defendant.

66.   This action presents numerous questions of fact common to all Defendants, including but not limited to: how Defendants implement the same 5G network functions and procedures required by the 5G Standard; whether Defendants' 5G services practice each limitation of the asserted patent claims; and how Defendants' coordinated commercialization and wholesale provision of 5G services gives rise to direct and/or induced infringement.

67.   Plaintiffs do not seek joinder based merely on allegations that Defendants comply with the same technical standard.  Rather, joinder is proper

pursuant to § 299 because Defendants collectively offer the same accused 5G network service, engage in coordinated commercialization of network capabilities, and give rise to overlapping infringement proof.

68.    Severing Defendants into separate actions would require duplicative discovery, repeated adjudication of identical technical issues, and a substantial risk of inconsistent rulings regarding the same accused product.

69.    Accordingly, Defendants AT&T, Verizon, and T-Mobile are properly joined pursuant to 35 U.S.C. § 299(a).

70.    Specifically with respect to AT&T, AT&T Enterprises, AT&T Services, and AT&T Mobility are properly joined under § 299(a) because, on information and belief, AT&T Enterprises, AT&T Services, and AT&T Mobility commonly and/or jointly make, use, sell, offer to sell, and/or import the AT&T Wireless Networks such that at least one right to relief is asserted against AT&T Enterprises, AT&T Services, and AT&T Mobility jointly, severally, and in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, selling, offering to sell, and/or importing into the United States of the same AT&T Wireless Networks, and such that questions of fact common to AT&T Enterprises, AT&T Services, and AT&T Mobility will arise in this action.

71.     Specifically with respect to Verizon, VCI and Verizon Wireless are properly joined under § 299(a) because, on information and belief, VCI and Verizon Wireless commonly and/or jointly make, use, sell, offer to sell, and/or import the Verizon Wireless Networks such that at least one right to relief is asserted against VCI and Verizon Wireless jointly, severally, and in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, selling, offering to sell, and/or importing into the United States of the same Verizon Wireless Networks, and such that questions of fact common to VCI and Verizon Wireless will arise in this action.

## THE PATENTS-IN-SUIT

### U.S. PATENT NO. 9,838,104

72.     U.S. Patent No. 9,838,104 (the "'104 Patent") entitled, *System and Method for Fast Compression of OFDM Channel State Information (CSI) Based on Constant Frequency Sinusoidal Approximation*, was filed on February 16, 2017. The '104 Patent claims priority to U.S. Provisional Application No. 62/295,871, which was filed on February 16, 2016. A true and correct copy of the '104 Patent is attached hereto as Exhibit 1.

73.     At the time of the priority date in 2016, wireless communication systems, particularly those utilizing Orthogonal Frequency Division Multiplexing (OFDM) and Multiple-Input Multiple-Output (MIMO) technologies, faced a critical

technical bottleneck regarding Channel State Information (CSI) feedback.  As the number of antennas and subcarriers increased to improve data rates, the size of the CSI matrices describing the channel properties grew exponentially.  The prior art struggled with the "feedback overhead" problem, where transmitting accurate channel conditions from the receiver back to the transmitter consumed an excessive amount of the uplink bandwidth, reducing the overall efficiency and throughput of the wireless network.

74.    Prior to the claimed invention, conventional methods for reducing CSI feedback overhead relied on techniques that were either computationally prohibitive for mobile devices or resulted in significant data loss.  Standard approaches included simple quantization, which sacrificed accuracy for size, or rigid codebook-based selection that failed to capture the nuances of complex multipath fading channels. Techniques, such as continuous time domain parameter extraction, required iterative, non-linear algorithms to find the best-fitting sinusoids for the channel. These methods imposed a heavy computational burden on the receiver's processor, causing unacceptable latency and battery drain in mobile user equipment.  The claimed inventions taught in the '104 Patent arose from technical deficiencies in prior art systems.

75.    The inventions disclosed in the '104 Patent provide improvements to the functioning of the wireless network itself.  By compressing the CSI vector into

a small number of complex coefficients associated with constant frequency sinusoids, the inventions claimed in the '104 Patent drastically reduce the number of bits required for uplink feedback.  This improvement in bandwidth efficiency enhances the network's capacity, allowing the wireless system to support more users or higher data rates for the same amount of spectrum.

76.    The '104 Patent discloses systems and methods that improve the functioning of the receiver (*e.g.*, the mobile device or user equipment) by reducing the computational resources required to perform channel estimation.  By utilizing pre-computed constant frequency vectors and constant matrices, the invention replaces computationally expensive real-time calculus with simpler matrix multiplications and dot products.

77.    The '104 Patent improves the operation of the transmitter and the overall signal integrity of the wireless link.  Because the claimed compression technique achieves higher accuracy (lower fit residual) for a given number of bits compared to prior art quantization, the transmitter can perform more precise beamforming.  This results in a physical improvement to the signal-to-noise ratio (SNR) of the transmitted data, enhancing the reliability and speed of the wireless communication system.

78.    Plaintiffs own all rights to the '104 Patent that are necessary to bring this action, including all rights to sue for infringement and to recover past and future

damages.  Red Hills is the exclusive licensee of the '104 Patent, and FSURF is the owner by assignment of the '104 Patent.  Patent owner FSURF has voluntarily joined as a Plaintiff in this litigation.

79.    The Defendants are not licensed to practice the '104 Patent.

80.    The '104 Patent is valid and enforceable.

81.    The '104 Patent has been in full force and effect since its issuance.

## U.S. PATENT NO. 8,817,693

82.    U.S. Patent No. 8,817,693 (the "'693 Patent") entitled, *Intelligent Wi-Fi Packet Relay Protocol*, was filed on November 20, 2013.  The '693 Patent claims priority to U.S. Provisional Application No. 61/728,281, which was filed on November 20, 2012.  A true and correct copy of the '693 Patent is attached hereto as Exhibit 2.

83.    At the time of the invention, the field of wireless packet relay was characterized by significant technical limitations that prevented efficient range extension without substantial performance degradation.    Commercial range extenders operated through simple mechanical rebroadcasting of every packet received from the access point.  Prior art systems lacked any intelligent decision-making capability and would rebroadcast packets regardless of whether the intended recipient had already successfully received the original transmission, thereby consuming bandwidth unnecessarily and often reducing network throughput rather

than improving it.  This approach was particularly problematic when the node was close enough to the access point to receive packets directly, as the range extender's redundant retransmissions wasted valuable wireless medium time.

84.    At the time of the '693 Patent's priority date, conventional technology for extending wireless network range relied primarily on repeaters or commercial range extenders.  These prior art devices operated on a mechanical, indiscriminate basis, capturing and rebroadcasting every packet transmitted by an access point. This conventional approach created significant technical drawbacks, specifically degrading network throughput by occupying the wireless medium unnecessarily and increasing interference.  Because these devices blindly repeated data regardless of whether the receiving node actually needed assistance, they often reduced the overall efficiency of the network rather than enhancing it, particularly when a node was close enough to the access point to receive packets directly.

85.    The '693 Patent recites an ordered combination of elements that was unconventional and non-routine at the time of the invention.  Specifically, the '693 Patent teaches "configuring a relayer to monitor... and overhear data packets... and acknowledgement messages" combined with relaying packets based on a comparison of estimated Packet Receive Ratios (PRR). This arrangement departed from the conventional "always-on" repeater architecture.

86.    The '693 Patent teaches methods and systems that improve the functioning of wireless computer networks, specifically by improving packet delivery efficiency, extending network range, and increasing medium utilization.

87.    The '693 Patent is directed to a specific technical problem rooted in the physics of wireless communications: the degradation of signal quality over distance and the resulting packet loss that limits network range. The inventions disclosed in the '693 Patent solve this multi-variable problem through real-time passive measurement and algorithmic comparison, thereby improving the technical functioning of the wireless network by ensuring that relay resources are employed only when they will provide net benefit.

88.    The improvement to network functionality achieved by the claimed methods and systems taught in the '693 Patent include a reduction in airtime consumption (a finite physical resource in wireless networks). The '693 Patent specification discloses that the claimed method reduces average packet delivery airtime compared to both baseline networks without relayers and networks using commercial range extenders. This airtime reduction is a direct technical improvement to how the wireless medium is utilized: by intelligently selecting when to relay and at what data rate, minimizing the total transmission time required to successfully deliver packets.

89.    Plaintiffs own all rights to the '693 Patent that are necessary to bring this action, including all rights to sue for infringement and to recover past and future damages.  Red Hills is the exclusive licensee of the '693 Patent, and FSURF is the owner by assignment of the '693 Patent.  Patent owner FSURF has voluntarily joined as a Plaintiff in this litigation.

90.    The Defendants are not licensed to practice the '693 Patent.

91.    The '693 Patent is valid and enforceable.

92.    The '693 Patent has been in full force and effect since its issuance.

## DEVELOPMENT OF THE 5G NETWORK STANDARD

93.    The Accused Wireless Networks are the Defendants' wireless telecommunications networks, systems, and services that operate according to the 3GPP 5G New Radio (NR) standard (Release 15 and later) including the T-Mobile Wireless Networks, AT&T Wireless Networks, and Verizon Wireless Networks (collectively, the "Accused Wireless Networks").

94.    The Third Generation Partnership Project ("3GPP") is an organization that maintains and develops globally applicable technical specifications for cellular telecommunications technologies, including the specifications for implementation and use of mobile wireless communications for high-speed data referred to as the 4G/LTE and 5G Standards.

95.    Implementation and use of the 4G/LTE and 5G Standards, including but not limited to use of wireless communications products and services compliant with the 4G/LTE and 5G specifications as detailed in various 3GPP technical specification series, has increased in recent years and continues to increase at a rapid pace.

96.    3GPP uses a system of "releases" to provide developers with a stable platform for the implementation of features.  3GPP makes its technical specifications available through the 3GPP website, including Releases 8–19, which outline the 4G/LTE Standards and/or 5G Standards.  Each new release improves upon past releases and provides new standardized functionalities.  Release 8 was the basis for the deployment of the standard technology known as 4G/LTE.  Subsequent enhancements were incorporated into the 4G/LTE standards in later releases. Release 10, which includes the technology of Release 8, was the basis for the deployment of an advanced form of 4G/LTE called LTE-Advanced ("LTE-A"). Releases 9, 11, 12, 13, and 14 included important updates to the 4G/LTE and LTE-A standards.

97.    Release 15 introduced the first full set of 5G Standards and was the basis for deploying the entire suite of 5G functionalities.  Release 16 introduced additional 5G functionalities, including enhancements to many aspects of the 5G system, such as coverage, capacity, latency, power, mobility, reliability, and ease of

deployment.    Release 17 further enhanced 5G's technological foundations and broadened 5G's reach to new use cases, deployments, and network topologies.

## AT&T WIRELESS NETWORKS

98.    The    AT&T    Wireless    Networks    comprise    the    wireless telecommunications networks and services owned, operated, or controlled by AT&T that operate according to the 3GPP 5G New Radio (NR) standard (Release 15 and later), including services marketed as AT&T 5G and AT&T 5G+ (5G Plus).



*AT&T   Wireless   Coverage   Map,* AT&T   WEBSITE,   *available   at*: https://www.att.com/maps/wireless-coverage.html (last visited January 2026).

99.    AT&T operates and sells access to a mobile network that provides telecommunication, Internet, and other services to customers via cellular base stations located in this District and throughout the United States (the "AT&T Base

Stations"). The AT&T Base Stations employ technology that infringes the Patents-in-Suit by operating in accordance with the 3GPP 5G Standard.

100. AT&T operates and sells access to its AT&T Wireless Networks via 5G Gateway Devices that allow customers to access the internet via a 5G NR connection.

> AT&T Internet Air for Business delivers an internet connection via our reliable AT&T wireless network. With this type of connection, you'll need a compatible Wi-Fi® gateway to receive AT&T's wireless signal, which turns that signal into an internet connection for your business. This is sometimes also referred to as fixed wireless internet or 5G internet. . . . Connect a compatible Wi-Fi gateway with AT&T Internet Air for Business to AT&T's reliable wireless network. This setup provides your business with fixed wireless internet access and dependable connectivity wherever 5G coverage is available.

*AT&T 5G For Business FAQ*, AT&T BUSINESS WEBSITE, *available at*: https://www.business.att.com/portfolios/5G-for-business.html (last visited January 2026).

101. AT&T offers 5G Home Internet Service via AT&T 5G Gateways that are sold in this District and throughout the United States (the "AT&T 5G Gateways"). The AT&T 5G Gateways employ technology that infringes the Patents-in-Suit by operating in accordance with the 3GPP 5G Standard.



*AT&T Internet Air for Business 5G Gateway + Wi-Fi Extender User Guide*, AT&T PRODUCT DOCUMENTATION at 7, 57 (2024) (emphasis added).

102.   AT&T uses, offers for sale, sells, and markets AT&T 5G Gateways throughout this District.



*AT&T Internet Air Availability Webpage,* AT&T WEBSITE, *available at:* https://about.att.com/pages/internet-air (last visited January 2026).

103. AT&T states that it has a market-leading 5G mobile network, meaning that the network communicates in accordance with, at a minimum, 3GPP Release 15.

> 3GPP is a collaborative project aimed at developing globally acceptable specifications for the next generation mobile systems. The 3GPP caters to a large majority of the telecommunications networks in the world. 3GPP unites seven telecommunications standard development organizations (ARIB, ATIS, CCSA, ETSI, TSDSI, TTA, TTC), known as "Organizational Partners" and provides their members with a stable environment to produce the reports and specifications that define 3GPP technologies, such as 5G. In support of IMT-2020, 3GPP defined a two-phased 5G work program starting with study items in Release-14, followed by <u>two releases of specifications spanning Release-15 and Release-16,</u> with the goal <u>being that Release-16 includes everything</u>

needed to meet IMT-2020 requirements. Release-15 was completed in
March 2018 and Release-16 was scheduled for 2019.

AT&T WHITE PAPER: WILL 5G REPLACE WI-FI?, at 15 (2019) (emphasis added).

104.   The AT&T Wireless Networks, including the AT&T Base Stations and
AT&T 5G Gateways, operate in accordance with the 5G Standard, including at least
Releases 15, thereby infringing the Patents-in-Suit.  AT&T sells access to the AT&T
Wireless Networks, including through use of the AT&T 5G Gateways to customers,
advertising to these customers that AT&T's Wireless Networks operate in
accordance with the 5G Standard.

105.   AT&T operates and sells access to the infringing AT&T Wireless
Networks to customers in this District and throughout the United States through
smartphones, tablets, gateways, and other end-user devices (collectively, the "AT&T
5G Devices") that AT&T sells, distributes, or authorizes for use on its AT&T
Wireless Networks.  The AT&T 5G Devices are advertised by AT&T as supporting
5G and are configured to communicate using the 3GPP 5G NR Standard, including
at least Release 15.  AT&T sells and provides the AT&T 5G Devices to customers
for the purpose of enabling those customers to connect to and use AT&T's infringing
AT&T Wireless Networks, and AT&T thereby infringes the Patents-in-Suit by
providing 5G service to end customers via the AT&T 5G Devices it sold and enabled
for use on its network.

**VERIZON WIRELESS NETWORKS**

106.  The Verizon Wireless Networks comprise the wireless telecommunications networks and services owned, operated, or controlled by Verizon that operate according to the 3GPP 5G New Radio (NR) standard (Release 15 and later), including services marketed as Verizon 5G, Verizon 5G Ultra Wideband (5G UWB), Verizon 5G Home Internet, and Verizon 5G Business Internet.



*Verizon 5G Coverage Map,* VERIZON.COM WEBSITE, *available at:* https://www.verizon.com/coverage-map/ (last visited January 2026).

107.  Verizon operates and sells access to a mobile network that provides telecommunication, Internet, and other services to customers via cellular base stations located in this District and throughout the United States (the "Verizon Base Stations"). The Verizon Base Stations employ technology that infringes the Patents-in-Suit by operating in accordance with the 3GPP 5G Standard.

108.    Verizon operates and sells access to its Verizon Wireless Networks via 5G Gateway Devices that allow customers to access the internet via a 5G NR connection.

> Our gateways provide fixed wireless internet that sends and receives the data signal locally via our 5G and 4G wireless networks, which means low latency and reliable service. The gateways are a single-box solution that connects to the mobile network and also to your personal devices via Wi-Fi to give the customer a complete wireless internet experience to give the customer flexibility as to where they keep the router in the home. Our gateways are designed to allow customers to simply power them up by themselves and start using them within minutes.

*Providing fast internet, one innovation at a time,* Verizon.com Website, *available at:* https://www.verizon.com/home/internet/guides/providing-fast-internet-one-innovation-at-a-time/ (last visited January 2026).

109.    Verizon offers 5G Home Internet Service and 5G Business Internet Service via Verizon 5G Gateways that are sold in this District and throughout the United States (the "Verizon 5G Gateways").  The Verizon 5G Gateways employ technology that infringes the Patents-in-Suit by operating in accordance with the 3GPP 5G Standard.



*Verizon Internet Gateway for Business*, VERIZON USER GUIDE at 151 (2024) (describing that the Verizon 5G Gateway complies with the 5G NR Release 16 standard) (emphasis added); *Verizon Internet Gateway*, VERIZON USER GUIDE at 143 (2023) (describing that the Verizon 5G Gateway for Verizon 5G Home Internet Service complies with the 5G NR Release 16 standard) (emphasis added).

110.   Verizon uses, offers for sale, sells, and markets Verizon 5G Gateways throughout this District.

> This additional service is part of Verizon's massive multi-year network transformation which has not only brought 5G service to more than 230 million people and 5G home internet service to more than 40 million households, but has also added more capabilities, upgraded the technology in the network, paved the way for personalized customer experiences and provided a platform for enterprises and developers to drive innovation. "Verizon is committed to delivering our most reliable 5G network experience and meeting our customer's connectivity needs, no matter where they are. Our reliable, secure network connects families, friends, homes and businesses throughout Florida with our 5G

Ultra Wideband network," said Eric Lia, SVP of Engineering and Operations at Verizon.

*Verizon continues the gift-giving season with expanded service throughout Florida,* CONTIFY TELECOM NEWS (December 21, 2023).

111.   Verizon states that it has a market-leading 5G mobile network, meaning that the network communicates in accordance with, at a minimum, 3GPP Release 15, thereby infringing the Patents-in-Suit.

> What some may consider "5G towers" are in fact 5G small cells, or nodes. These are critical parts of the network architecture for Verizon as they help to enhance 4G LTE coverage and capacity while deploying the 5G Ultra Wideband Network. . . .  5G NR is the new globally specified radio access technology from 3GPP. 5G NR uses two frequency ranges: frequency range 1 (FR1), which includes 6 GHz frequency bands and below, and frequency range 2 (FR2), which includes the millimeter wavelength range. The millimeter wavelength range will help enable 5G Ultra Wideband.

*What is 5G Architecture*, VERIZON.COM BUSINESS WEBSITE, *available at*: https://www.verizon.com/business/en-au/resources/articles/5g-architecture/ (last visited January 2026).

112.  Verizon Wireless Networks, including the Verizon 5G Gateways, operate in accordance with the 5G Standard, including Release 15, thereby infringing the Patents-in-Suit.   Verizon sells access to the Verizon Wireless Networks and Verizon 5G Gateways to customers, advertising to these customers that Verizon's network operates in accordance with the 5G Standard.

113.   Verizon operates and sells access to the infringing Verizon Wireless Networks to customers in this District and throughout the United States through smartphones, tablets, gateways, and other end-user devices (collectively, the "Verizon 5G Devices") that Verizon sells, distributes, or authorizes for use on its

Verizon Wireless Networks. The Verizon 5G Devices are advertised by Verizon as supporting 5G and are configured to communicate using the 3GPP 5G NR Standard, including at least Release 15. Verizon sells and provides the Verizon 5G Devices to customers for the purpose of enabling those customers to connect to and use Verizon's infringing Verizon Wireless Networks, and Verizon thereby infringes the Patents-in-Suit by providing 5G service to end customers via the Verizon 5G Devices it sold and enabled for use on its network.

### T-MOBILE WIRELESS NETWORKS

114. The T-Mobile Wireless Networks comprise the wireless telecommunications networks and services owned, operated, or controlled by T-Mobile that operate according to the 3GPP 5G New Radio (NR) standard (Release 15 and later), including services marketed as T-Mobile 5G and 5G Ultra Capacity (5G UC).



*T-Mobile Completes $2B Network Expansion in Florida, Covering Entire State with Ultra Fast 5G Coverage*, T-MOBILE NEWSROOM WEBSITE (July 2, 2025), *available at*: https://www.t-mobile.com/news/network/t-mobile-network-investment-florida.

115.    T-Mobile operates and sells access to a mobile network that provides telecommunication, Internet, and other services to customers via cellular base stations located in this District and throughout the United States (the "T-Mobile Base Stations").  The T-Mobile Base Stations employ technology that infringes the Patents-in-Suit by operating in accordance with the 5G Standard.

116.    T-Mobile operates and sells access to its T-Mobile Wireless Networks via 5G Gateway Devices that allow customers to access the internet via a 5G NR connection.

> T-Mobile Internet service is powered by America's largest 5G network in locations we determine will receive a great internet experience.  You receive service through a 5G Gateway device (which combines the capabilities of a router and a modem), the Gateway device then converts the 5G signal to Wi-Fi, and provides a Wi-Fi signal. · The T-Mobile

Rely Internet, T-Mobile Amplified Internet, T-Mobile All-In Internet and AWAY™ plans have our 5-year price guarantee so you won't have to worry about exploding bills and price hikes (exclusions like taxes and fees apply).

*T-Mobile 5G Home Internet – Got Questions,* T-MOBILE WEBSITE, *available at*: https://www.t-mobile.com/home-internet/transfer-internet-service (last visited January 2026).

117. T-Mobile offers 5G Home Internet Service via T-Mobile 5G Gateways that are sold in this District and throughout the United States (the "T-Mobile 5G Gateways"). The T-Mobile 5G Gateways employ technology that infringes the Patents-in-Suit by operating in accordance with 3GPP 5G Standard.



*Next Generation Broadband Technology: 5G Home Internet,* T-MOBILE 5G HOME INTERNET PRESENTATION at 3 (November 2023).

118. T-Mobile uses, offers for sale, sells, and markets T-Mobile 5G Gateways throughout this District.

T-Mobile 5G Home Internet is an affordable and convenient Wi-Fi solution available to over 6 million households across Florida — that's more than 50% of homes statewide. Leveraging T-Mobile's leading

5G network, the internet service offers fast speeds with a simple 15-minute self-installation

*T-Mobile Completes $2B Network Expansion in Florida, Covering Entire State with Ultra Fast 5G Coverage*, T-MOBILE NEWSROOM WEBSITE (July 2, 2025), *available at*: https://www.t-mobile.com/news/network/t-mobile-network-investment-florida.

119. T-Mobile states that it has a market-leading 5G mobile network, meaning that the network communicates in accordance with, at a minimum, 3GPP Release 15, thereby infringing the Patents-in-Suit.

In fact, industry groups such as 3GPP, in whose activities T-Mobile participates, have already developed protocols and standards for 5G networks that include open interfaces. All three nationwide providers have been building networks that take advantage of the open interfaces in 3GPP architectures. T-Mobile, in particular (and as noted below), has developed a standalone 5G network that takes advantage of 3GPP 5G end-to-end solutions that use open interfaces and the ability to mix and match vendors.

*Comments of T-Mobile USA, Inc., In the Matter of 5G Challenge Notice Inquiry Dkt. No. 210105-0001*, BEFORE THE NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION (February 10, 2021).

120. T-Mobile Wireless Networks, including the T-Mobile 5G Gateways, operate in accordance with the 5G Standard, thereby infringing the Patents-in-Suit. T-Mobile sells access to the T-Mobile Wireless Networks and T-Mobile 5G Gateways to customers, advertising to these customers that T-Mobile's Wireless Networks operate in accordance with the and 5G Standard.

121. T-Mobile operates and sells access to the infringing T-Mobile Wireless Networks to customers in this District and throughout the United States through smartphones, tablets, gateways, and other end-user devices (collectively, the "T-Mobile 5G Devices") that T-Mobile sells, distributes, or authorizes for use on its T-

Mobile Wireless Networks.  The T-Mobile 5G Devices are advertised by T-Mobile as supporting 5G and are configured to communicate using the 3GPP 5G NR Standard, including at least Release 15.  Verizon sells and provides the T-Mobile 5G Devices to customers for the purpose of enabling those customers to connect to and use T-Mobile's infringing T-Mobile Wireless Networks, and T-Mobile thereby infringes the Patents-in-Suit by providing 5G service to end customers via the T-Mobile 5G Devices it sold and enabled for use on its network.

## COUNT I
## INFRINGEMENT OF THE '104 PATENT

122.   U.S. Patent No. 9,838,104 was duly and legally issued on December 5, 2017, for an invention entitled, "System and Method for Fast Compression of OFDM Channel State Information (CSI) Based on Constant Frequency Sinusoidal Approximation."

123.   Plaintiffs own all rights to the '104 Patent that are necessary to bring this action.

124.   Defendants are not licensed to practice the '104 Patent.

125.   Without authorization, AT&T has directly infringed and continues to infringe, and has induced infringement by others, by operating, using, offering, and providing equipment and services that practice one or more claims of the '104 Patent, either literally or under the doctrine of equivalents (collectively, the "AT&T '104 Accused Instrumentalities").   At a minimum, the AT&T '104 Accused

Instrumentalities include: (1) the AT&T Wireless Networks, including AT&T Base Stations and associated network equipment configured to operate in accordance with the 3GPP 5G New Radio (NR) Standard, including at least Release 15 (or later), and (2) the AT&T 5G Devices that are configured to operate in accordance with 3GPP 5G NR Release 15 (or later).

126.   Without authorization, Verizon has directly infringed and continues to infringe, and has induced infringement by others, by operating, using, offering, and providing equipment and services that practice one or more claims of the '104 Patent, either literally or under the doctrine of equivalents (collectively, the "Verizon '104 Accused Instrumentalities").   At a minimum, the Verizon '104 Accused Instrumentalities include: (1) the Verizon Wireless Networks, including Verizon Base Stations and associated network equipment configured to operate in accordance with the 3GPP 5G New Radio (NR) Standard, including at least Release 15 (or later), and (2) the Verizon 5G Devices that are configured to operate in accordance with 3GPP 5G NR Release 15 (or later).

127.   Without authorization, T-Mobile has directly infringed and continues to infringe, and has induced infringement by others, by operating, using, offering, and providing equipment and services that practice one or more claims of the '104 Patent, either literally or under the doctrine of equivalents (collectively, the "T-Mobile '104 Accused Instrumentalities").   At a minimum, the T-Mobile '104

Accused Instrumentalities include: (1) the T-Mobile Wireless Networks, including T-Mobile Base Stations and associated network equipment configured to operate in accordance with the 3GPP 5G New Radio (NR) Standard, including at least Release 15 (or later), and (2) the T-Mobile 5G Devices that are configured to operate in accordance with 3GPP 5G NR Release 15 (or later).

128.    Defendants operate, import, sell, offer for sale, use, and market the T-Mobile '104 Accused Instrumentalities, Verizon '104 Accused Instrumentalities, and/or AT&T '104 Accused Instrumentalities (collectively, the "'104 Accused Instrumentalities") in this District and throughout the United States.

129.    Defendants infringe and/or induce infringement of the '104 Patent by making, using, selling, offering for sale, and/or importing into the United States the '104 Accused Instrumentalities.

130.    The '104 Accused Instrumentalities perform a computer-implemented method of compressing channel state information ("CSI") of a wireless channel.  The Defendants and their customers directly infringe the '104 Patent under 35 U.S.C. § 271(a) by using the claimed methods in the United States.

131.    The Defendants infringe at least claim 1 of the '104 Patent by operating, using, testing, selling, and/or offering for sale the '104 Accused Instrumentalities. The Defendants practice a method of compressing CSI of a wireless channel.  For example, in providing 5G wireless services, the Defendants utilize User Equipment

("UE") receivers and gNodeB ("gNB") transmitters configured to perform CSI reporting and beamforming. This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

132.   The Defendants practice the step of receiving, at a receiver of a wireless communication system, an orthogonal frequency division multiplexing (OFDM) wireless signal over a wireless channel comprising one or more antenna pairs. Specifically, the 5G NR Release 15 Standard defines a Type II CSI codebook, which provides a method for compressing the CSI of a wireless channel. The UE measures channel state information (CSI) and reports a compressed representation using precoder matrix indicators (PMI) and coefficient vectors that represent the channel state in a compressed form. This functionality requires the '104 Accused Instrumentalities, in their entirely assembled form, as specifically provisioned and operated by Defendants.

5.2.2.2.3        Type II Codebook

For 4 antenna ports {3000, 3001, …, 3003}, 8 antenna ports {3000, 3001, …, 3007}, 12 antenna ports {3000, 3001, …, 3011}, 16 antenna ports {3000, 3001, …, 3015}, 24 antenna ports {3000, 3001, …, 3023}, and 32 antenna ports {3000, 3001, …, 3031}, and the UE configured with higher layer parameter *codebookType* set to 'typeII'

-   The values of $N_1$ and $N_2$ are configured with the higher layer parameter *n1-n2-codebookSubsetRestriction*. The supported configurations of $(N_1, N_2)$ for a given number of CSI-RS ports and the corresponding values of $(O_1, O_2)$ are given in Table 5.2.2.1-2. The number of CSI-RS ports, $P_{CSI-RS}$, is $2N_1N_2$.

-   The value of $L$ is configured with the higher layer parameter *numberOfBeams*, where $L = 2$ when $P_{CSI-RS} = 4$ and $L \in \{2,3,4\}$ when $P_{CSI-RS} > 4$.

3GPP TS 38.214 v15.16 § 5.2.2.2.3 (emphasis added).

133.   The Defendants practice the step of receiving, at a receiver of a wireless communication system, an orthogonal frequency division multiplexing (OFDM) wireless signal over a wireless channel comprising one or more antenna pairs. Specifically, the '104 Accused Instrumentalities, in conformance with the 5G NR Standard, use OFDM as the signal waveform for both downlink and uplink.  The UE (receiver) receives OFDM-based signals including CSI-RS (Channel State Information Reference Signals) transmitted by the gNB over multiple antenna ports for channel measurement.   This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

Zero-power (ZP) and non-zero-power (NZP) CSI-RS are defined

- for a non-zero-power CSI-RS configured by the *NZP-CSI-RS-Resource* IE or by the *CSI-RS-Resource-Mobility* field in the *CSI-RS-ResourceConfigMobility* IE, the sequence shall be generated according to clause 7.4.1.5.2 and mapped to resource elements according to clause 7.4.1.5.3

- for a zero-power CSI-RS configured by the *ZP-CSI-RS-Resource* IE, the UE shall assume that the resource elements defined in clause 7.4.1.5.3 are not used for PDSCH transmission subject to clause 5.1.4.2 of [6, TS 38.214]. The UE performs the same measurement/reception on channels/signals except PDSCH regardless of whether they collide with ZP CSI-RS or not.

3GPP TS 38.211 v15.10 § 7.4.1.5.1 (emphasis added).

134.   The Defendants practice the step of measuring, at a receiver of a wireless communication system, a channel state information (CSI) vector of the wireless channel from the received OFDM wireless signal for each antenna pair, wherein the CSI vector is an N by 1 vector of complex numbers and wherein each complex number represents an amplitude and a phase of one of N orthogonal

frequency division multiplexing (OFDM) subcarriers of the wireless channel. Specifically, the '104 Accused Instrumentalities measure CSI from received OFDM signals including CSI-RS. The measurements are performed on resource elements across OFDM subcarriers, producing complex-valued channel estimates (amplitude and phase) for each subcarrier in the measurement bandwidth. The Type II codebook operates on channel measurements spanning $N\_SB$ subbands across the frequency domain. This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

| Definition | CSI reference signal received power (CSI-RSRP), is defined as the linear average over the power contributions (in [W]) of the resource elements of the antenna port(s) that carry CSI reference signals configured for RSRP measurements within the considered measurement frequency bandwidth in the configured CSI-RS occasions. |
|---|---|
| | For CSI-RSRP determination CSI reference signals transmitted on antenna port 3000 according to TS 38.211 [4] shall be used. If CSI-RSRP is used for L1-RSRP, CSI reference signals transmitted on antenna ports 3000, 3001 can be used for CSI-RSRP determination. |
| | For intra-frequency CSI-RSRP measurements, if the measurement gap is not configured, UE is not expected to measure the CSI-RS resource(s) outside of the active downlink bandwidth part. |
| | For frequency range 1, the reference point for the CSI-RSRP shall be the antenna connector of the UE. For frequency range 2, CSI-RSRP shall be measured based on the combined signal from antenna elements corresponding to a given receiver branch. For frequency range 1 and 2, if receiver diversity is in use by the UE, the reported CSI-RSRP value shall not be lower than the corresponding CSI-RSRP of any of the individual receiver branches. |

3GPP TS 38.215 v15.07 § 5.1.2 (emphasis added).

135. The Defendants practice the step of accessing a plurality of configurations stored at the receiver, wherein each of the plurality of configurations "u," identifies a set of $P_u$ base sinusoid vectors on constant frequencies and wherein $P_u$ is the order of the configuration and is equal to the number of complex numbers of the compressed CSI if configuration u is selected. Specifically, the '104 Accused

Instrumentalities, in compliance with the 5G NR Standard, use the Type II CSI codebook that defines multiple configurations based on the parameter L (number of beams). The '104 Accused Instrumentalities access configurations stored in the codebook that identify sets of L base DFT vectors (sinusoid vectors) from an oversampled DFT matrix. Each configuration 'L' determines the number of DFT basis vectors used and consequently the size (2*L complex coefficients per layer) of the compressed CSI representation. This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

The $L$ vectors combined by the codebook are identified by the indices $i_{1,1}$ and $i_{1,2}$, where

$$i_{1,1} = \begin{bmatrix} q_1 & q_2 \end{bmatrix}$$
$$q_1 \in \{0,1,\ldots,O_1-1\}$$
$$q_2 \in \{0,1,\ldots,O_2-1\}$$
$$i_{1,2} \in \left\{0,1,\ldots,\binom{N_1 N_2}{L}-1\right\}.$$

Let

$$n_1 = \begin{bmatrix} n_1^{(0)},\ldots,n_1^{(L-1)} \end{bmatrix}$$
$$n_2 = \begin{bmatrix} n_2^{(0)},\ldots,n_2^{(L-1)} \end{bmatrix}$$
$$n_1^{(i)} \in \{0,1,\ldots,N_1-1\}$$
$$n_2^{(i)} \in \{0,1,\ldots,N_2-1\}$$

3GPP TS 38.214 v15.16 § 5.2.2.2.3 (emphasis added).

136. The '104 Accused Instrumentalities calculate, for each of the plurality of configurations, a dot product of the N by 1 CSI vector and a conjugate of each $P_u$

base sinusoid vector identified by the selected configuration to generate a $P_u$ by 1 projection vector. The '104 Accused Instrumentalities use DFT basis vectors vm,l that are defined as complex exponentials (sinusoids). The '104 Accused Instrumentalities project the measured channel onto these DFT basis vectors. The precoder codebook entry W is constructed as a linear combination of L selected DFT vectors, which mathematically corresponds to computing dot products between the channel and conjugate DFT vectors to obtain projection coefficients. This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.



3GPP TS 38.214 v15.16 § 5.2.2.2.3 (emphasis added).

137. The '104 Accused Instrumentalities calculate for each of the plurality of configurations, a product of a constant $P_u$ by $P_u$ matrix stored at the receiver and the $P_u$ by 1 projection vector to generate a $P_u$ by 1 coefficient vector. Specifically, the '104 Accused Instrumentalities apply quantization/normalization

transformations to the projection coefficients. The wideband amplitude coefficients p(1)l,i and subband amplitude coefficients p(2)l,i are derived through defined mapping operations specified in tables. The strongest coefficient is used as a reference for normalization, implementing a transformation equivalent to matrix multiplication for coefficient scaling. This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

for $l = 1, \ldots, \nu$. The mapping from $k_{l,i}^{(1)}$ to the amplitude coefficient $p_{l,i}^{(1)}$ is given in Table 5.2.2.2.3-2 and the mapping from $k_{l,i}^{(2)}$ to the amplitude coefficient $p_{l,i}^{(2)}$ is given in Table 5.2.2.2.3-3. The amplitude coefficients are represented by

$$p_l^{(1)} = \left[ p_{l,0}^{(1)}, p_{l,1}^{(1)}, \ldots, p_{l,2L-1}^{(1)} \right]$$

$$p_l^{(2)} = \left[ p_{l,0}^{(2)}, p_{l,1}^{(2)}, \ldots, p_{l,2L-1}^{(2)} \right]$$

for $l = 1, \ldots, \nu$.

3GPP TS 38.214 v15.16 § 5.2.2.2.3 (emphasis added).

138. The '104 Accused Instrumentalities calculate for each of the plurality of configurations, a minimum squared error (MSE) fit with the $P_u$ by 1 coefficient vector on L evenly-spaced locations, where L is smaller than N, by multiplying each of the $P_u$ base sinusoids with the corresponding coefficient in the coefficient vector and taking the summation, at each of the L evenly-spaced locations. Specifically, the '104 Accused Instrumentalities compute channel estimates at subband locations (L locations smaller than total subcarriers N) by linear combination of DFT basis vectors with the computed coefficients. The precoder W for each subband is constructed by summing the product of each DFT basis vector vm,l with its

corresponding amplitude $p(1) \cdot p(2)$ and phase $\varphi l,i$ coefficients, effectively performing an MSE-minimizing reconstruction at each subband location. This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.



3GPP TS 38.214 v15.16 § 5.2.2.2.3.

139. The '104 Accused Instrumentalities select configuration u and use its $P_u$ by 1 coefficient vector as the compressed CSI, if the total fit residual of the MSE fit of configuration u is below a predetermined threshold times the minimum fit residual among all configurations, and u is such a configuration with the lowest order. Specifically, the '104 Accused Instrumentalities use the Type II codebook for selecting among different configurations. The parameter L (number of beams) and K(2) (number of non-zero coefficients) define different compression levels. The '104 Accused Instrumentalities select configurations based on reporting quality - the strongest coefficient i1,3,l is identified and used as a reference. The number of reported non-zero coefficients is bounded by min(2L-1, M_l, K(2)), selecting the

lowest-complexity configuration that achieves adequate representation quality. This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

The strongest coefficient on layer $l$, $l = 1,\ldots,\upsilon$ is identified by $i_{1,3,l} \in \{0,1,\ldots,2L-1\}$.

The amplitude coefficient indicators $i_{1,4,l}$ and $i_{2,2,l}$ are

$$i_{1,4,l} = \left[ k_{l,0}^{(1)}, k_{l,1}^{(1)}, \ldots, k_{l,2L-1}^{(1)} \right]$$

$$i_{2,2,l} = \left[ k_{l,0}^{(2)}, k_{l,1}^{(2)}, \ldots, k_{l,2L-1}^{(2)} \right]$$

$$k_{l,i}^{(1)} \in \{0,1,\ldots,7\}$$

$$k_{l,i}^{(2)} \in \{0,1\}$$

3GPP TS 38.214 v15.16 § 5.2.2.2.3 (the selection of $K^{(2)}$ strongest coefficients implements threshold-based configuration selection).

140. The '104 Accused Instrumentalities transmit the compressed CSI to a transmitter of the wireless communication system. Specifically, the 5G NR Standard specifies that the '104 Accused Instrumentalities transmit CSI reports containing PMI (which includes the compressed coefficient information) to the gNB (transmitter) via PUCCH or PUSCH. The CSI report includes the codebook indices i1 and i2 which together represent the compressed CSI. This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

> A UE may be configured with a *CSI-ReportConfig* with the higher layer parameter *reportQuantity* set to either 'none', 'cri-RI-PMI-CQI ', 'cri-RI-i1', 'cri-RI-i1-CQI', 'cri-RI-CQI', 'cri-RSRP', 'ssb-Index-RSRP' or 'cri-RI-LI-PMI-CQI'.
>
> If the UE is configured with a *CSI-ReportConfig* with the higher layer parameter *reportQuantity* set to 'none', then the UE shall not report any quantity for the *CSI-ReportConfig*.
>
> If the UE is configured with a *CSI-ReportConfig* with the higher layer parameter *reportQuantity* set to 'cri-RI-PMI-CQI', or 'cri-RI-LI-PMI-CQI', the UE shall report a preferred precoder matrix for the entire reporting band, or a preferred precoder matrix per subband, according to clause 5.2.2.2.

3GPP TS 38.214 v15.16 § 5.2.1.4.2 (emphasis added).

141. The '104 Accused Instrumentalities decompress the CSI at the transmitter by computing a linear combination of the base sinusoids, using the compressed CSI as the coefficients of the base sinusoids. Specifically, the '104 Accused Instrumentalities reconstruct the full precoder matrix from the reported compressed CSI by computing a linear combination of the DFT basis vectors using the reported amplitude and phase coefficients. The precoder W is computed as a weighted sum of the L DFT vectors $v_{m,l}$ with their corresponding complex coefficients $p(1) \cdot p(2) \cdot e^{(j\varphi)}$. This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.



3GPP TS 38.214 v15.16 § 5.2.2.2.3 (emphasis added).

142. The '104 Accused Instrumentalities adjust the transmission characteristics of one or more wireless signals transmitted by the transmitter based upon the decompressed CSI. The '104 Accused Instrumentalities use the reconstructed precoder matrix derived from the CSI feedback to adjust transmission characteristics including precoding weights applied to PDSCH transmission. The precoder matrix W is used to determine how data is spatially multiplexed across antenna ports, directly adjusting the transmission characteristics based on the decompressed channel state information. This functionality requires the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

---

### 5.1.1    Transmission schemes

Only one transmission scheme is defined for the PDSCH, and is used for all PDSCH transmissions.

#### 5.1.1.1    Transmission scheme 1

For transmission scheme 1 of the PDSCH, the UE may assume that a gNB transmission on the PDSCH would be performed with up to 8 transmission layers on antenna ports 1000-1011 as defined in clause 7.3.1.4 of [4, TS 38.211], subject to the DM-RS reception procedures in clause 5.1.6.2.

---

3GPP TS 38.214 v15.16 § 5.1.1 (emphasis added).

143.    The Claims of the '104 Patent, including but not limited to independent claim 1, are essential to certain 5G Standards, including Release 15 (and later) and its technical specifications, including but not limited to TS 38.101, TS 38.211, TS 38.213, TS 38.214, TS 38.215, and TS 38.331, which include technologies covered by the '104 Patent.

144.    Defendants design, make, use, sell, and/or offer for sale the '104 Accused Instrumentalities in the United States.

145.    Defendants and/or Defendants' subsidiaries and/or affiliates use the '104 Accused Instrumentalities in regular business operations.

146.    Defendants have directly infringed and continue to directly infringe the '104 Patent by, among other things, making, using, offering for sale, and/or selling the '104 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

147.    By making, using, testing, offering for sale, and/or selling wireless networking devices and services compliant with the 5G NR Standard, including but

not limited to the '104 Accused Instrumentalities, Defendants have injured Plaintiffs and are liable to the Plaintiffs for directly infringing (literally and equivalently) one or more claims of the '104 Patent, including at least claim 1 pursuant to 35 U.S.C. § 271(a).

148.  Defendants also indirectly infringe the '104 Patent by actively inducing infringement under 35 U.S.C. § 271(b).  As an example, Defendants advertise and encourage end users to utilize the '104 Accused Instrumentalities to send and receive OFDM channel state information (CSI) in compliance with the 5G NR Standard.

149.  Defendants have had knowledge of the '104 Patent and its infringement thereof since at least service of this Complaint in the above-captioned action or shortly thereafter.

150.  Defendants intended to induce patent infringement by third-party customers and users of the '104 Accused Instrumentalities and had knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement.  Defendants specifically intended and were aware that the normal and customary use of the '104 Accused Instrumentalities would infringe the '104 Patent.  Defendants performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '104 Patent and with the knowledge that the induced acts would constitute infringement.  For example, Defendants provide the '104 Accused

Instrumentalities that have the capability of operating in a manner that infringes one or more of the claims of the '104 Patent, including at least claim 1, and Defendants further advertise the '104 Accused Instrumentalities so that consumers will purchase and use the products in their ordinary and customary manner of use (*i.e.*, in compliance with the 5G NR Standard), thus inducing those customers to infringe the '104 Patent.  On information and belief, Defendants advertise all of the '104 Accused Instrumentalities as complying with the 5G NR Standard.   By providing instruction and training to customers and end-users on how to use the '104 Accused Instrumentalities in a manner that directly infringes one or more claims of the '104 Patent, including at least claim 1, Defendants specifically intended to induce infringement of the '104 Patent.  Defendants engaged in such inducement to promote the sales of the '104 Accused Instrumentalities, *e.g.*, through Defendants' user manuals, product support, marketing materials, and training materials to actively induce the users of the '104 Accused Instrumentalities to infringe the '104 Patent.  Accordingly, Defendants have induced and continue to induce users of the '104 Accused Instrumentalities to use the '104 Accused Instrumentalities in their ordinary and customary way to infringe the '104 Patent, knowing that such use constitutes infringement of the '104 Patent.

151.   Defendants are utilizing the technology claimed in the '104 Patent without paying a reasonable royalty.   Defendants are willfully and deliberately infringing the '104 Patent.

152.   To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '104 Patent.

153.   As a result of Defendants' infringement of the '104 Patent, Plaintiffs have suffered monetary damages and seek recovery in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants together with interest and costs as fixed by the Court.

## COUNT II
## INFRINGEMENT OF THE '693 PATENT

154.   U.S. Patent No. 8,817,693 was duly and legally issued on August 26, 2014, for an invention entitled, "Intelligent Wi-Fi Packet Relay Protocol."

155.   Plaintiffs own all rights to the '693 Patent that are necessary to bring this action.

156.   Defendants are not licensed to practice the '693 Patent.

157.   Without authorization, AT&T has directly infringed and continues to directly infringe, and has induced infringement by others, by operating, using, offering, and providing equipment and services that practice one or more claims of the '693 Patent, either literally or under the doctrine of equivalents (collectively, the

"AT&T '693 Accused Instrumentalities"). At a minimum, the AT&T '693 Accused Instrumentalities includes: (1) the AT&T Wireless Networks, including AT&T Base Stations and associated network equipment configured to operate in accordance with the 3GPP 5G New Radio (NR) Standard, including at least Release 15 (or later), and (2) all AT&T 5G Gateways that are configured to operate in accordance with 3GPP 5G NR Release 15 (or later).

158.   Without authorization, Verizon has directly infringed and continues to directly infringe, and has induced infringement by others, by operating, using, offering, and providing equipment and services that practice one or more claims of the '693 Patent, either literally or under the doctrine of equivalents (collectively, the "Verizon '693 Accused Instrumentalities").   At a minimum, the Verizon '693 Accused Instrumentalities includes: (1) the Verizon Wireless Networks, including Verizon Base Stations and associated network equipment configured to operate in accordance with the 3GPP 5G New Radio (NR) Standard, including at least Release 15 (or later), and (2) all Verizon 5G Gateways that are configured to operate in accordance with 3GPP 5G NR Release 15 (or later).

159.   Without authorization, T-Mobile has directly infringed and continues to directly infringe, and has induced infringement by others, by operating, using, offering, and providing equipment and services that practice one or more claims of the '693 Patent, either literally or under the doctrine of equivalents (collectively, the

"T-Mobile '693 Accused Instrumentalities"). At a minimum, the T-Mobile '693 Accused Instrumentalities includes: (1) the T-Mobile Wireless Networks, including T-Mobile Base Stations and associated network equipment configured to operate in accordance with the 3GPP 5G New Radio (NR) Standard, including at least Release 15 (or later), and (2) all T-Mobile 5G Gateways that are configured to operate in accordance with 3GPP 5G NR Release 15 (or later).

160.   The T-Mobile 5G Gateways, Verizon 5G Gateways, and AT&T 5G Gateways (collectively, the "5G Gateways") are operated, used, sold, imported, and marketed by Defendants in this District and throughout the United States.

161.   Defendants operate, sell, offer for sale, import, test, use, and market the T-Mobile '693 Accused Instrumentalities, Verizon '693 Accused Instrumentalities, and/or AT&T '693 Accused Instrumentalities (collectively, the "'693 Accused Instrumentalities") in this District and throughout the United States.

162.   Defendants infringe and/or induce infringement of the '693 Patent by making, using, selling, offering for sale, and/or importing into the United States the '693 Accused Instrumentalities.

163.   The '693 Accused Instrumentalities perform a computer-implemented method of packet relay in a network. The Defendants and their customers directly infringe the '693 Patent under 35 U.S.C. § 271(a) by using the claimed methods in the United States.

164.   The Defendants infringe at least claim 1 of the '693 Patent by providing the '693 Accused Instrumentalities.  The Defendants practice a method of packet relay via Multi-Radio Dual Connectivity (MR-DC) and CU/DU Split Architecture. Specifically, the '693 Accused Instrumentalities utilize MR-DC (3GPP TS 37.340) where data is relayed to the node via a relayer.   The 5G NR Release 15 Standard defines a split architecture (CU/DU) allowing centralized control of packet relaying. This functionality requires the '693 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

| 4        Multi-Radio Dual Connectivity |
| --- |
| 4.1      General |
| 4.1.1      Common MR-DC principles |
| Multi-Radio Dual Connectivity (MR-DC) is a generalization of the Intra-E-UTRA Dual Connectivity (DC) described in TS 36.300 [2], where a multiple Rx/Tx capable UE may be configured to utilise resources provided by two different nodes connected via non-ideal backhaul, one providing NR access and the other one providing either E-UTRA or NR access. One node acts as the MN and the other as the SN. The MN and SN are connected via a network interface and at least the MN is connected to the core network. |

3GPP TS 37.340 v15.16 § 4.1.1 (emphasis added).

165.   The '693 Accused Instrumentalities, in compliance with the 5G NR Release 15 Standard, perform a method for managing packet delivery and relaying undelivered packets as described in TS 38.401, which describes the overall architecture of the NG-RAN.

> **8.3    Mechanism of centralized retransmission of lost PDUs**
>
> **8.3.1    Centralized Retransmission in Intra gNB-CU Cases**
>
> This mechanism allows to perform the retransmission of the PDCP PDUs that are not delivered by a gNB-DU (gNB-DU1) because the corresponding radio links toward the UE are subject to outage. When such outage occurs, the gNB-DU affected by outage informs the gNB-CU of such event. The gNB-CU can switch transmission of data traffic, as well as perform retransmission of undelivered PDCP PDUs, from the gNB-DU affected by outage to other available gNB-DUs (e.g. gNB-DU2 in Figure 8.3.1-1) with a well-functioning radio link toward the UE. The mechanism is also applicable in EN-DC and MR-DC with 5GC, refer to TS 37.340 [12].

3GPP TS 38.401 v15.10 § 8.3.1 (emphasis added).

166.    The '693 Accused Instrumentalities configure a relayer to monitor a communications channel between an access point and a node and overhear data packets sent by the access point to the node and acknowledgement messages sent by the node to the access point.    Specifically, the '693 Accused Instrumentalities include a secondary node (relayer) that is configured to receive data from the master node (access point) and monitor acknowledgements (HARQ/RLC) from the 5G Gateways.    In compliance with the 5G NR Release 15 Standard, the relayer is configured to monitor a communications channel between the master node and the 5G Gateway.    The master node configures the secondary node to handle split bearers via RRC signaling.    This functionality requires the '693 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.



**Figure 10.2.1-1: Secondary Node Addition procedure**

1. The MN decides to request the SN to allocate resources for a specific E-RAB, indicating E-RAB characteristics (E-RAB parameters, TNL address information corresponding to bearer type). In addition, for bearers requiring SCG radio resources, MN indicates the requested SCG configuration information, including the entire UE capabilities and the UE capability coordination result. In this case, the MN also provides the latest measurement results for SN to choose and configure the SCG cell(s). The MN may request the SN to allocate radio resources for split SRB operation. The MN always provides all the needed security information to the SN (even if no SN terminated bearers are setup) to enable SRB3 to be setup based on SN decision. In case of bearer options that require X2-U resources between the MN and the SN, the MN provides X2-U TNL address information for the respective E-RAB, X2-U DL TNL address information for SN terminated bearers, X2-U UL TNL address information for MN terminated bearers. In case of SN terminated split bearers the MN provides the maximum QoS level that it can support. The SN may reject the request.

3GPP TS 37.340 v15.16 § 10.2.1 (emphasis added).

167.    The '693 Accused Instrumentalities are configured in compliance with the 5G NR Release 15 Standard to overhear data packets sent by the master node to the secondary node.  Specifically, the master node (access point) in the '693 Accused Instrumentalities sends data intended for the 5G Gateway (node) to the secondary node (relayer) via the X2-U or Xn-U interface. The secondary node overhears these packets for the purpose of relaying them to the 5G Gateway.   In compliance with the 5G NR Release 15 Standard, the '693 Accused Instrumentalities are configured

such that the master node configures the user plane so that data packets are transferred to the secondary node (relayer).



Figure 4.3.2.1-1: U-Plane connectivity for EN-DC (left) and MR-DC with 5GC (right).

3GPP TS 37.340 v15.16 § 4.3.2.1 (emphasis added).

168.    The '693 Accused Instrumentalities, in compliance with the 5G NR Release 15 Standard, configure the relayer to overhear the data packets sent by the access point.  The relayer in the '693 Accused Instrumentalities detects the sequence numbers of the packets sent by the access point intended for the node.

The purpose of the Transfer of Downlink User Data procedure is to provide NR-U specific sequence number information at the transfer of user data carrying a DL NR PDCP PDU from the node hosting the NR PDCP entity to the corresponding node.

An NR user plane protocol instance making use of the Transfer of Downlink User Data procedure is associated to a single data radio bearer only.

The node hosting the NR PDCP entity shall assign consecutive NR-U sequence numbers to each transferred NR-U packet. A retransmitted NR PDCP PDU shall be assigned a new NR-U sequence number.

The node hosting the NR PDCP entity indicates to the corresponding node whether this NR-U packet is a retransmission of NR PDCP PDU.

The node hosting the NR PDCP entity can indicate to the corresponding node to either discard all NR PDCP PDUs up to and including a defined DL discard NR PDCP PDU SN or discard one or a number of blocks of downlink NR PDCP PDUs.

If the Assistance Information Report Polling Flag is equal to 1, the corresponding node shall, if supported, send the ASSISTANCE INFORMATION DATA to the node hosting the NR PDCP entity.

The corresponding node shall detect whether an NR-U packet was lost and memorise the respective sequence number after it has declared the respective NR-U packet as being "lost".

3GPP TS 38.425 v15.7 § 5.4.1.1 (emphasis added).

169. The '693 Accused Instrumentalities, in compliance with the 5G NR Release 15 Standard, configure the relayer to monitor acknowledgment messages sent by the node to the access point. Specifically, the relayer monitors the channel for HARQ-ACKs and RLC Status Reports sent by the 5G Gateway. *See* 3GPP TS 38.214 v15.16 § 5.3 ("the UE shall provide a valid HARQ-ACK message") and 3GPP TS 38.425 v15.7 § 5.5.3.18 (describing that the relayer tracks "Highest Delivered NR PDCP SN" based on the acknowledgements received from the node).

### 5.3.2.1    HARQ Entity

The MAC entity includes a HARQ entity for each Serving Cell, which maintains a number of parallel HARQ processes. Each HARQ process is associated with a HARQ process identifier. The HARQ entity directs HARQ information and associated TBs received on the DL-SCH to the corresponding HARQ processes (see clause 5.3.2.2).

The number of parallel DL HARQ processes per HARQ entity is specified in TS 38.214 [7]. The dedicated broadcast HARQ process is used for BCCH.

3GPP TS 38.321 v15.14 § 5.3.2.1 (emphasis added).

71

170.    The '693 Accused Instrumentalities perform the step of estimating, by the relayer, a plurality of packet receive ratios based on the overheard data packets and the acknowledgement messages.    Specifically, the '693 Accused Instrumentalities estimate packet receive ratios by calculating lost packet reports across a plurality of HARQ processes.    In compliance with the 5G NR Release 15 Standard, the '693 Accused Instrumentalities contain a relayer that estimates ratios for multiple data streams simultaneously.    This functionality requires the '693 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

| | |
|---|---|
| **5** | **Physical downlink shared channel related procedures** |
| **5.1** | **UE procedure for receiving the physical downlink shared channel** |

For downlink, a maximum of 16 HARQ processes per cell is supported by the UE. The number of processes the UE may assume will at most be used for the downlink is configured to the UE for each cell separately by higher layer parameter *nrofHARQ-ProcessesForPDSCH*, and when no configuration is provided the UE may assume a default number of 8 processes.

3GPP TS 38.214 v15.16 § 5.1 (emphasis added) (describing the process wherein the '693 Accused Instrumentalities track success/failure, creating a plurality of receive metrics).

171.    The '693 Accused Instrumentalities, in compliance with the 5G NR Release 15 Standard, estimate packet receive ratios.    Specifically, the secondary node calculates delivery success rates that are reported back to the master node.    By comparing the total transmitted packets versus successfully delivered packets versus lost packets, the '693 Accused Instrumentalities estimate packet receive ratios.

The Downlink Data Delivery Status procedure is also used to provide feedback from the corresponding node to the node hosting the NR PDCP entity to allow the node hosting the NR PDCP entity to control the successful delivery of DL control data to the corresponding node.

When the corresponding node decides to trigger the feedback for Downlink Data Delivery procedure it shall report as specified in section 5.2:

   a) in case of RLC AM, the highest NR PDCP PDU sequence number successfully delivered in sequence to the UE among those NR PDCP PDUs received from the node hosting the NR PDCP entity i.e. excludes those retransmission NR PDCP PDUs;

   b) the desired buffer size in bytes for the concerned data radio bearer;

   c) optionally, the desired data rate in bytes associated with a specific data radio bearer configured for the UE;

   d) the NR-U packets that were declared as being "lost" by the corresponding node and have not yet been reported to the node hosting the NR PDCP entity within the DL DATA DELIVERY STATUS frame;

   e) if retransmission NR PDCP PDUs have been delivered, the NR PDCP PDU sequence number associated with the highest NR-U sequence number among the retransmission NR PDCP PDUs successfully delivered to the UE in sequence of NR-U sequence number;

3GPP TS 38.425 v15.7 § 5.4.1.1 (emphasis added).

172.   The '693 Accused Instrumentalities perform the step of invoking the relayer to relay for the node based on the results of an algorithm that compares two or more of the plurality of packet receive ratios.  Specifically, the '693 Accused Instrumentalities use a flow control algorithm to compare delivery ratios and invoke the secondary node to relay data.  The master node in the '693 Accused Instrumentalities compares the packet receive ratios against desired data rates and buffer sizes.  This functionality requires the '693 Accused Instrumentalities in their entirely assembled form, as specifically provisioned and operated by Defendants.

> The node hosting the NR PDCP entity, when receiving the DL DATA DELIVERY STATUS frame:
>
> - regards the desired buffer size under b) and the data rate under c) above as the amount of data to be sent from the hosting node:
>
>   - If the value of the desired buffer size is 0, the hosting node shall stop sending any data per bearer.
>
>   - If the value of the desired buffer size in b) above is greater than 0, the hosting node may send up to this amount of data per bearer starting from the last "Highest successfully delivered NR PDCP Sequence Number" for RLC AM if received, or the hosting node may send up to this amount of data per bearer starting from the last "Highest transmitted NR PDCP Sequence Number" for RLC UM if received.
>
>   - The value of the desired data rate in c) above is the amount of data desired to be received in a specific amount of time. The amount of time is 1 sec.
>
>   - The information of the buffer size in b) above and of the data rate in c) above is valid until the next DL DATA DELIVERY STATUS frame is received.
>
> - is allowed to remove the buffered NR PDCP PDUs of a RLC AM bearer, according to the feedback of successfully delivered NR PDCP PDUs;
>
> - decides upon the actions necessary to take for NR PDCP PDUs reported other than transmitted and/or successfully delivered.

3GPP TS 38.425 v15.7 § 5.4.2.1 (emphasis added).

173.    The '693 Accused Instrumentalities, in compliance with the 5G NR Release 15 Standard, invoke a relayer based on the results of the algorithm (*e.g.*, detection of a "Radio Link Outage" or high loss ratio). The relayer is invoked by the '693 Accused Instrumentalities to perform packet retransmission or adjust packet flow based on the results of the algorithm that compares packet receive ratios.

> ### 8.3.1    Centralized Retransmission in Intra gNB-CU Cases
>
> This mechanism allows to perform the retransmission of the PDCP PDUs that are not delivered by a gNB-DU (gNB-DU1) because the corresponding radio links toward the UE are subject to outage. When such outage occurs, the gNB-DU affected by outage informs the gNB-CU of such event. The gNB-CU can switch transmission of data traffic, as well as perform retransmission of undelivered PDCP PDUs, from the gNB-DU affected by outage to other available gNB-DUs (e.g. gNB-DU2 in Figure 8.3.1-1) with a well-functioning radio link toward the UE. The mechanism is also applicable in EN-DC and MR-DC with 5GC, refer to TS 37.340 [12].

3GPP TS 38.401 v15.10 § 8.3.1 (emphasis added).

174.    The Claims of the '693 Patent, including but not limited to independent claim 1, are essential to certain 5G Standards, including Release 15 (and later) and its technical specifications, including but not limited to TS 38.321 v15.14, TS 38.214

v15.16, TS 38.331 v15.30, TS 38.322 v15.5, TS 38.323 v15.8, TS 38.401 v15.10, TS 38.425 v15.7, and TS 37.340 v15.16, which include technologies covered by the '693 Patent.

175.    Defendants design, make, use, sell, and/or offer for sale the '693 Accused Instrumentalities in the United States.

176.    One or more of Defendants and/or Defendants' subsidiaries and/or affiliates use the '693 Accused Instrumentalities in regular business operations.

177.    Defendants have directly infringed and continue to directly infringe the '693 Patent by, among other things, making, using, testing, offering for sale, and/or selling the '693 Accused Instrumentalities.  The functionality recited in the '693 Patent has been incorporated into the 5G NR Standard Release 15 and later.

178.    The '693 Accused Instrumentalities are available to businesses and individuals throughout the United States.

179.    By making, using, testing, offering for sale, and/or selling wireless networking devices and services compliant with the 5G NR Standard, including but not limited to the '693 Accused Instrumentalities, Defendants have injured Plaintiffs and are liable to the Plaintiffs for directly infringing (literally and equivalently) one or more claims of the '693 Patent, including at least claim 1 pursuant to 35 U.S.C. § 271(a).

180.    Defendants also indirectly infringe the '693 Patent by actively inducing infringement under 35 U.S.C. § 271(b).  As an example, Defendants advertise and encourage end users to utilize the '693 Accused Instrumentalities to perform packet relay in compliance with the 5G NR Standard.

181.    Defendants have had knowledge of the '693 Patent and its infringement thereof since at least service of this Complaint in the above-captioned action or shortly thereafter.

182.    Defendants intended to induce patent infringement by third-party customers and users of the '693 Accused Instrumentalities and had knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement.  Defendants specifically intended and were aware that the normal and customary use of the '693 Accused Instrumentalities would infringe the '693 Patent.  Defendants performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '693 Patent and with the knowledge that the induced acts would constitute infringement.  For example, Defendants provide the '693  Accused Instrumentalities that have the capability of operating in a manner that infringes one or more of the claims of the '693 Patent, including at least claim 1, and Defendants further advertise the '693 Accused Instrumentalities so that consumers will purchase and use the products, thus inducing those customers to infringe the '693 Patent.  On

information and belief, Defendants advertise all of the '693 Accused Instrumentalities as complying with the 5G NR Standard.   By providing instruction and training to customers and end-users on how to use the '693 Accused Instrumentalities in a manner that directly infringes one or more claims of the '693 Patent, including at least claim 1, Defendants specifically intended to induce infringement of the '693 Patent.  Defendants engaged in such inducement to promote the sales of the '693 Accused Instrumentalities, e.g., through Defendants' user manuals, product support, marketing materials, and training materials to actively induce the users of the '693 Accused Instrumentalities to infringe the '693 Patent. Accordingly, Defendants have induced and continue to induce users of the '693 Accused Instrumentalities to use the '693 Accused Instrumentalities in their ordinary and customary way to infringe the '693 Patent, knowing that such use constitutes infringement of the '693 Patent.

183.   Defendants are utilizing the technology claimed in the '693 Patent without paying a reasonable royalty.   Defendants are willfully and deliberately infringing the '693 Patent.

184.   To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '693 Patent.

185.   As a result of Defendants' infringement of the '693 Patent, Plaintiffs have suffered monetary damages and seek recovery in an amount adequate to

compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants together with interest and costs as fixed by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Florida State University Research Foundation, Inc. and Red Hills Signal Systems, LLC respectfully request that this Court enter:

A.    A judgment in favor of Plaintiffs that Defendants have infringed, either literally and/or under the doctrine of equivalents, the '104 and '693 Patents;

B.    An award of damages resulting from Defendants' acts of infringement in accordance with 35 U.S.C. § 284;

C.    A judgment and order finding that Defendants' infringement was willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate within the meaning of 35 U.S.C. § 284 and awarding enhanced damages to Plaintiffs.

D.    A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding reasonable attorneys' fees to Plaintiffs against Defendants.

E.    Any and all other relief to which Plaintiffs may show themselves

to be entitled.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs Florida State University Research Foundation, Inc. and Red Hills Signal Systems, LLC request a trial by jury of any issues so triable by right.

Dated:  January 26, 2026

OF COUNSEL:

Dorian S. Berger (*pro hac vice application forthcoming*)
Daniel P. Hipskind (*pro hac vice application forthcoming*)
Erin E. McCracken (*pro hac vice application forthcoming*)
BERGER & HIPSKIND LLP
9538 Brighton Way, Ste. 320
Beverly Hills, CA 90210
Telephone: 323-886-3430
Facsimile: 323-978-5508
E-mail: dsb@bergerhipskind.com
E-mail: dph@bergerhipskind.com
E-Mail: eem@bergerhipskind.com

BROOKS, LEBOEUF, FOSTER, GWARTNEY, & HOBBS P.A.

/s/ *Dean R. LeBoeuf*
Dean R. LeBoeuf, FBN 0328715
909 East Park Avenue
Tallahassee, FL 32301
Telephone: (850) 222-2000
Facsimile: (850) 222-9757
Primary E-mail:
dean@TallahasseeAttorneys.com
Secondary E-Mail:
craig@TallahasseeAttorneys.com
arianne@TallahasseeAttorneys.com

*Attorneys for Florida State University Research Foundation, Inc. and Red Hills Signal Systems, LLC*